UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
LINDA ROBILOTTA,

                Plaintiff,

    -against-

THE FLEET BOSTON FINANCIAL
CORPORATION GROUP DISABILITY
INCOME PLAN, FLEET BOSTON
FINANCIAL CORPORATION, as Plan
Administrator, and LIBERTY LIFE
ASSURANCE COMPANY OF
BOSTON.

              Defendants.
-------------------------------------------------------X

**MEMORANDUM & ORDER**

Civil Action No. 05-5284

**A P P E A R A N C E S:**

**For the Plaintiff**
**DeHaan Busse LLP**
300 Rabro Drive, suite 101
Hauppauge, New York 11788
By:    John W. DeHaan, Esq.

**For the Defendants**
**Chorpenning, Good, Carlet & Garrison, Esqs.**
645 Fifth Avenue - Suite 703
New York, New York 10020
By:    Michael J. Zaretsky, Esq.
       Virginia t. Shea, Esq.

**HURLEY, Senior District Judge:**

       This action arises out of a claim by plaintiff Linda Robilotta ("Plaintiff" or "Robilotta")

for long term disability benefits ("LTD benefits") under a Group Disability Income Policy

("Policy") issued by defendant Liberty Life Assurance Company ("Liberty") to Plaintiff's

employer FleetBoston Financial Corporation ("Fleet") (Liberty and Fleet as collectively referred to as "Defendants"). The Policy funds the LTD benefits provided under an employee benefit plan established by Fleet and for which Fleet is the Plan Administrator. The Fleet plan and the benefits at issue are governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. Section 1001, et seq. After Liberty denied Plaintiff's claim for LTD benefits, Plaintiff commenced this action to recover those LTD benefits, together with attorneys' fees. Presently before the Court are Defendants' motion and Plaintiff's cross motion for summary judgment. For the reasons set forth below, Defendants' motion is granted and Plaintiff's cross-motion is denied.

## BACKGROUND

The following material facts, drawn from the parties' summary judgment submissions, are undisputed unless otherwise noted.

### *The Parties*

Plaintiff was born in December 1951 and resides in Nesconset, New York. At the time she stopped working in May 2001, Robilotta was employed by Fleet as a Branch Operations Supervisor at Fleet's Hauppauge, New York branch and was covered by the Policy. Fleet is the designated Plan Administrator and agent for service of process. Liberty is the insurer and claims administrator; it pays the benefits provided by the Policy.

### *The Policy and Summary Plan Description*

The Policy provides that Liberty has discretion to interpret the Policy. It states:

> Liberty shall possess the authority, in its sole discretion, to
> construe the terms of this policy and to determine benefit eligibility
> hereunder. Liberty decisions regarding construction of the terms of

this policy and benefit eligibility shall be conclusive and binding.

(Administrative Record ("AR") 401).

According to the Policy's Summary Plan Description (the "SPD"), employees of Fleet are entitled to a disability benefit equal to 40%, 50% or 60% of their annual base pre-(disability) salary, depending upon their benefit election. In Plaintiff's case, she elected coverage equal to 60% of her pre-disability income. (AR 374).

The SPD states that LTD benefits commence after the expiration of a 180-day Elimination Period, during which the employee must be totally or partially disabled. The Policy also contains a 180-day Elimination Period. (AR 377).

The SPD defines the terms "disability" and "disabled" as follows:

> For Plan purposes, disability and disabled mean that because of injury or illness:
> - During the first 24 months of benefits, you cannot perform each of the material substantial duties of your occupation as an active employee.
> - After benefits have been paid for 24 months, you cannot perform with reasonable continuity, all of the material and substantial duties of your own or any occupation for which you are or become reasonably fitted by training, education, experience, age, and physical and mental capacity.

The Policy contains a similar, and functionally equivalent, definition of the terms "disability" and "disabled:"

> **"Disability" or Disabled"** means:
> 1. For persons other than pilots, co-pilots, and crew of an aircraft:
>    I. If the Covered Person is eligible for the 24 Month Own Occupation Benefit, **"Disability"** or **"Disabled"** means during the Elimination Period and the next 24 months of Disability the Covered Person is unable to perform all of the material and

substantial duties of his occupation on an Active
Employment basis because of an Injury or Sickness;
and

ii.    After 24 months of benefits have been paid, the
Covered Person is unable to perform, with
reasonable continuity, all of the material and
substantial duties of his own occupation or any
other occupation for which he is or becomes fitted
by training, education, experience, age and physical
and mental capacity.

(AR 379-80).

Both the SPD and the Policy provide that LTD benefits continue to age sixty-five, if the

disability commences before the claimant's sixtieth birthday.  (AR 378).

Under the Policy, LTD benefits are reduced by the amount of disability benefits that a

claimant receives, or is eligible to receive, from the Social Security Administration.  (AR 388).

The SPD actually requires a claimant to apply for Social Security disability benefits.  According

to the SPD, Liberty Life may  provide assistance on Social Security disability claims to disabled

Fleet employees:

Often, LTD recipients are not immediately accepted as disabled
when applying for Social Security disability benefits.  Because
proper third-party representation throughout the LTD process
greatly increases the chances of a Social Security disability award
being made, Liberty may be available to aid LTD recipients at no
cost. . . .  If you are receiving LTD benefits and Social Security has
not accepted you as disabled, Liberty may assist you in pursuing
your Social Security claim.  For assistance please contact your
Liberty claims manager.

The  SPD acknowledges that the Social Security Administration utilizes a different definition of

"disability" than the LTD Plan:

**Note:**  Because Social Security's definition of disability differs
from Fleet's, many claimants entitled to benefits under the Fleet

4

LTD Plan may not be eligible or immediately eligible for benefits from Social Security. . . .

With respect to the commencement of an action for benefits, the Policy provides, in pertinent part:

**Legal Proceedings**
A claimant or the claimant's authorized representative cannot start any legal action:
1. until 60 days after proof of claim has been given; nor
2. more than one year after the time proof of claim is required.

However, the SPD does not contain a limitation on a claimant's time to file a lawsuit to recover disability benefits.

### *Chronology of Events*

Plaintiff has a history of right knee pain going back to 1997, and she underwent surgery on her right knee in 1998. (AR 352-70). In or about March of 2001, she began "experiencing some rather painful symptoms around the medial aspect of her right knee." (AR 352). On March 27, 2001, she was examined by Kevin G. Vesey, M.D., an orthopedic surgeon. According to Dr. Vesey's notes: "The patient states that she stands all the time now and is very active at work where as previously she had a much more sedentary position." *Id.* During that visit, Dr. Vesey ordered an MRI of the right knee to determine whether or not Plaintiff had a torn medial meniscus. (*Id.*)

Plaintiff had an MRI of her right knee performed on April 3, 2001, which revealed a peripheral tear in the medial meniscus. (AR 339). On April 23, 2001, Dr. Vesey reviewed the MRI report and, according to his notes, recommended an arthroscopic evaluation to Plaintiff. (AR 352). Plaintiff consented to the surgery and it was performed on May 14, 2001. Her last

day of work was May 12, 2001. During the surgery, Dr. Vesey "found essentially no abnormalities except for very mild chondromalacia of the femoral condyle." (AR 309).

According to Dr. Vesey, the expected recovery time for Plaintiff's knee surgery was estimated at six weeks. (AR 321). On May 22, 2001, one week after her right knee arthroscopy, Dr. Vesey noted that Plaintiff continued to experience pain, which he then attributed to a possible disc herniation:

> On further questioning, the patient is complaining of some very severe ill-defined pain described as burning in nature on both the medial and lateral aspects and up the thigh. Hip range of motion is normal and straight leg raisin is normal. Neurosensory examination is normal.
>
> My impression is that this patient may in fact have a herniated disc and I am ordering an MRI scan of the lumbosacral spine. I have asked her not to start any physical therapy until we resolve this. I have also given her a prescription for Vicoprofen 1 q. 4 h. p.r.n.

(AR 309). He completed Physical Capacities and Restrictions Forms on May 23, 2001. He opined that Plaintiff would be "totally disabled" for approximately six weeks, commenting that she had pain and cramping in her right knee, and he noted that an MRI had been positive for a "tear," apparently in the medial miniscus of the right knee, and that he planned to refer her for a MRI of the lumbar-sacral spine to "rule out" a herniated disc. (AR 337-38; 329).

On June 8, 2001, Plaintiff had an MRI of her lumbar spine, in which the radiologist noted the following:

> There is disc space narrowing and degenerative endplate signal change noted at L4-5, and L5-S1. There is marked disc space narrowing also noted at L4-5. There is degenerative Schmorl's node formation noted at L4-5 as well. . . .

(AR 327). No focal disc herniations were noted.

On June 20, 2001, Plaintiff returned to Dr. Vesey for a follow up visit. (AR 309). During that visit, Dr. Vesey reviewed the June 8 MRI films himself and noted "a significant bulging disc." (AR 309). Dr. Vesey further noted that Plaintiff "continues to be quite symptomatic" so he injected her knee with Cortisone and Xylocaine, which had no effect on the pain and led Dr. Vesey "to believe there is no local inflammatory process in the knee." (AR 309). Dr. Vesey recommended that Plaintiff seek "treatment of the lumbosacral spine." (AR 309).

On June 20, 2001, Dr. Vesey completed a Restrictions Form, on which he indicated that Plaintiff was "totally disabled until further notice." (AR 320). In a letter of June 26, 2001, Dr. Vesey stated that he had advised Plaintiff to "remain out of work and on bed rest," and that although he was aware that her job allowed her to "sit all day," he felt "this is an unacceptable position for her to be in, due to lumbar radiculopathy." (AR 318).

On or about June 27, 2001, Plaintiff came under the care of Mark J. Sterling, M.D. a physiatrist, for her back complaints. (AR 312, 183). At that time Dr. Sterling opined that Plaintiff was "totally disabled," stating she could not (1)stand for more than one hour; (2) sit for more than one- half hour; (3) bend or twist; and (4) lift greater than ten pounds. (AR 312).

On or about August 1, 2001, Dr. Vesey completed a Physical Capacities Form (AR 283) and a Restrictions Form (AR 282). He reported on the Physical Capacities Form that Plaintiff could sit for four hours, stand for one hour, walk for two hours, each with a break "every 90 minutes." In a narrative comment on the Physical Capacities Form, he opined that Plaintiff could work six hours per day with frequent breaks and that she was unable to stand or sit for longer than one-half hour. (AR 283). On the Restrictions Form, Dr. Vesey reported that Plaintiff

should not engage in "prolonged sitting or standing" or any kneeling or climbing or lifting more than ten pounds. (AR 282). He authorized Plaintiff to attempt to return to work part-time – for six hours per day. (AR 129, 275-76). Fleet would not accommodate Plaintiff's restrictions and limitations, so she did not attempt to return to work at that time. (AR 129, 287).

Dr. Sterling, Plaintiff's physiatrist, completed a Physical Capacities Form on July 30, 2001 in which he restricted Plaintiff to sitting for six hours with a break every hour, standing for one hour with a break every fifteen minutes and walking for one hour with a break every fifteen minutes, among other restrictions. He felt she could lift ten to twenty pounds five times per day, and she could work an eight hour day, three days per week. (AR 268). Dr. Sterling updated this form on September 6, 2001 and opined that Plaintiff would be able to return to work, approximately, on September 20, 2001. (AR 267).

In a Restrictions Form completed by Dr. Sterling and received by Liberty on October 11, 2001, he diagnosed "myofacial [sic] pain syndrome, fibromyalgia and lumbosacral intervertebral disc syndrome." He restricted Plaintiff from any bending, twisting, lifting greater than ten pounds, pushing or pulling. (AR 265).

Plaintiff underwent trigger point injections to her back on September 27, 2001 and October 3, 2001. (AR 252, 255).

An EMG performed on October 2, 2001 was normal and nerve conduction studies were normal except for evidence of a right superficial peroneal neuropathy, but there was "[n]o evidence of lumbosacral radiculopathy seen." (AR 258-62).

On October 15, 2001, Liberty Life contacted MedicoLegal Services Inc. to request an independent medical examination of Plaintiff by an "Orthopedic Spinal Specialist." Because of

Plaintiff's claimed inability to ride in a car for longer than thirty to forty minutes, Liberty requested that a doctor be found as close to her home as possible and "if no Orthodedic (Sic) then use Physiatrist . . . ."  (AR 247-51).

On October 25, 2001, Plaintiff was examined by Craig Rosenberg, M.D., who is a physiatrist.  Plaintiff described her job duties to Dr. Rosenberg as lifting up to fifteen pounds and daily teller work requiring constant standing and frequent walking with intermittent climbing of stairs.  She complained of frequent low back pain with some improvement following two trigger point injections, occasional neck pain and occasional right knee burning sensations.  Dr. Rosenberg performed a physical examination that included observation of her gait and movement in the examining room, as well as an active range of motion evaluation, motor strength evaluation, neurological examination, spinal examination and examination of her right knee.  He also reviewed Plaintiff's prior medical records, which he detailed in his report.  His impression was that she was suffering from chronic low back pain evidenced by an MRI showing degenerative disc disease primarily at the L4-5 level and status post arthroscopy of the right knee with findings of chondromalacia of the distal femur.  Dr. Rosenberg found no evidence of lumbosacral radiculopathy.  He felt that Plaintiff's complaints of numbness along her right leg were not consistent with EMG/NCV results (which had evidenced right superficial peroneal neuropathy).  Dr. Rosenberg opined that Plaintiff could return to work with restrictions, and he completed an attached physical capacity worksheet, in which he opined that Plaintiff could sit for five hours with a break every two hours, could stand for five hours with a break every two hours, could walk for four hours with a break every two hours, could lift ten pounds or less, frequently, and could lift ten to twenty pounds, occasionally.  (AR 195-207).

Dr. Rosenberg supplemented his report on November 9, 2001 and stated that Plaintiff could work a modified job for eight hours per day; that is, sitting and standing for up to five hours per work day with breaks every two hours, walking for up to four hours with breaks every two hours, among other restrictions. (AR 188).

Fleet completed a Physical Job Evaluation Form for Plaintiff on or about November 5, 2001 in which her job duties were listed as processing customer transactions and processing cash/branch balancing. Physical requirements of the job included sitting 50% of the time, standing 50%, lifting 5%, walking 20%, typing 70% and lifting ten pounds or less, among other requirements. Her job allowed her to change positions frequently. (AR 192).

By letter of November 19, 2001 (AR 189-191), Liberty denied Plaintiff's claim for LTD benefits as she was not "Disabled" as defined by the Policy. In the letter, Liberty explained that Dr. Rosenberg had determined that Plaintiff was capable of returning to work full time with restrictions which included sitting and standing for up to five hours, walking for up to four hours, squatting ½ hour, no bending or kneeling and occasional lifting of ten to twenty pounds. (AR 189). Liberty also explained that it had received her job description from Fleet and that the primary physical demands of her occupation required her to type most of the day, sit and stand half of the day, walk ¼ of the day, limited lifting of 10 pounds or less and minimal bending, reaching, stooping squatting, driving and traveling. Liberty noted that it had sent a copy of Dr. Rosenberg's report to her doctor, Mark Sterling, for his comment by November 16, 2006, but that no comment had been received by Liberty. Liberty stated that based upon Dr. Sterling's lack of objective medical support for his opinion of total disability, and his lack of response to

Dr. Rosenberg's report, it concluded that Plaintiff did not meet the Policy's definition of "disability" and denied her claim for LTD benefits. (AR 189-91).

On November 21, 2001, Liberty sent Plaintiff a notice that her short term disability benefits had been exhausted, i.e., she had received Short term disability benefits during the LTD Policy's entire Elimination Period.

Plaintiff appealed Liberty's decision by her undated letter received by Liberty on or about November 28, 2001. (AR 163-64). Plaintiff claimed that Liberty did not have the correct description of duties for the job that she actually did, and she provided a June 1, 1997 "Position Description" for a "Branch Ops Sup I" from another branch of Fleet. (AR 157). That description noted required physical abilities that included the ability to stand or sit, to move coin bags, and the ability to perform "light physical work." (AR 159-60).[1] Plaintiff also submitted additional medical records, including a letter from Timothy Groth, M.D., stating that he had treated her with epidural steroid injections on December 17, 2001 and January 7, 2002. (AR 152).

Plaintiff also forwarded a November 25, 2001 letter from Dr. Sterling, her physiatrist, who commented on Dr. Rosenberg's report. (AR 165). Among other things, Dr. Sterling stated "Ultimately, Plaintiff should be able to return to full duty at her previous occupation. Incidentally, Dr. Rosenberg concurs that Ms. Robilotta does have a permanent partial disability from her condition. As such, if the restrictions that were presented by Dr. Rosenberg cannot be met, Plaintiff would have to be totally disabled, according to the rules of the New York State Disability Law." (AR 165).

_____

[1] Plaintiff maintains that the list of job duties is incomplete.

On February 4, 2002, Liberty wrote to Plaintiff advising her that there would be a delay in its appeal decision because Liberty was waiting for records from new medical appointments Plaintiff had scheduled. In that letter, Liberty took the position that Dr. Sterling's November 25, 2001 letter did not dispute, and, effectively, endorsed Dr. Rosenberg's opinion of her restrictions and limitations. Liberty also reminded Plaintiff that "disability" is defined in the Policy as the inability to perform the material and substantial duties of her occupation, and was not limited to her specific place of employment. (AR 146).

By letter of February 13, 2002, Liberty contacted Fleet and informed it of the capabilities and restrictions and the work capacity specifics identified by Dr. Rosenberg with which Dr. Sterling had agreed. Liberty asked Fleet to advise it of whether the capabilities/restrictions were consistent with Plaintiff's job demands and if not, whether Fleet could make accommodations for her. (AR 144-5). Fleet informed Liberty in a telephone conversation of February 13, 2002, and in a letter of February 28, 2002 (signed by Anne Bloom of Fleet on March 1, 2002) that the restrictions/capabilities identified by Dr. Rosenberg "are consistent with job demands;" that "no pushing or pulling is required and, if occasional tasks entailing bending be needed, co-workers are available to perform same;" and that these "physical job demands/accommodations" were present since November 2001. (AR 124-25, 143, 144-45).

On March 4, 2002, Timothy Groth, M.D., a board certified anesthesiologist, performed Bilateral Facet Joint Injections at L4-5 and Bilateral Sacroiliac Joint Injections in an attempt to alleviate Plaintiff's lower back pain. (AR 122-23). Dr. Groth described how, under fluoroscope, he performed the procedure:

> Using a 22 gauge spinal needle, the L4-5 facet on the left and the
> sacroiliac joint on the left were entered and each was injected with
> bupivacaine .5% 2cc and Celestone 3 mg. Attention was then
> given to the right side and this was repeated at the L4-5 facet and
> the sacroiliac joint. Each being injected with buvicaine .5% with
> Celestone 3 mg. The needles were removed, the back cleansed of
> all Betadine and dry sterile dressings were applied. . . .

(AR 123).

On March 8, 2002, Plaintiff reported to Liberty Life that "facet block has not helped" and also advised that she had to discontinue taking Oxycontin because she had experienced an allergic reaction. (AR 120).

On March 14, 2002, Plaintiff had another MRI performed on her lumbar spine. (AR 118-19). In addition to disc desiccation from L2 to S1, this MRI also noted bulging discs at L2-3 and L3-4, and "disc protrusions" at L4-5 and L5-S1. (AR 118).

Additional medical records submitted by Plaintiff during the appeal process included a March 21, 2002 report from Nathaniel L. Tindel, M.D., who saw Plaintiff in consultation, diagnosed L4-5 discogenic disease, opined that surgery was not warranted and rendered no disability opinion. (AR 114-15). Dr. Dennis P. Sall, a chiropractor, examined Plaintiff on April 5, 2002. After review of Plaintiff's "subjective history, subjective complaints, past treatment modalities and diagnostic tests results" (he did not mention which treatment modalities he reviewed nor which diagnostic test records he reviewed), Dr. Sall "felt that it would be in [Plaintiff's] best health interest not to work at this time." (AR 98).

On April 2, 2002, Frederick B. Gutman, M.D. saw Plaintiff for a neurological consultation. Dr. Gutman opined that Plaintiff "seems to be suffering from a lumbar radiculopathy," that her "disc herniations and degenerative changes were providing modest

compression on the nerve roots" and that surgical intervention might be considered. Dr. Gutman offered no opinion as to Plaintiff's functional capacity or ability to work. (AR 96-97).

On April 15, 2002, Ms. Robilotta underwent a Lumbar Sympathetic Block, performed by Dr. Groth. As reported by Dr. Groth:

> Using a 22 gauge spinal needle, the needle was passed under fluoroscopic imaging until it contacted with the body of L2 below the transverse process. The angle was then increased and the needle was passed toward the anterior portion of the body. At this time, the position of the needle was confirmed in both the AP and lateral planes and then confirmed with dye injection. At this time bupivacaine .25% with epinephrine 1-2000,000, 30cc in 5 cc increments was injected. The needle was removed, the back cleansed of all Betadine, and a dry sterile dressing was applied.

(AR 088).

Liberty referred the Plaintiff's claim for further review to its consulting physician, Gale G. Brown, Jr. M.D. (AR 1). Dr. Brown's report, a Memorandum of May 6, 2002 (AR 68-76), listed and detailed the medical records that he reviewed and opined that they did not substantiate a verifiable medical impairment; particularly, Plaintiff's right knee operative report revealed only mild findings of chondromalacia and her knee exams were objectively normal. Despite complaints of low back pain and leg pain, Plaintiff's physical exam revealed that her lumbar disease was limited to restrictions in active range of motion and some tightness/spasm. Findings of superficial peroneal neuropathy on EMG testing was of unclear clinical significance as it did not correlate with her clinical complaints. (AR 68-69). Dr. Brown determined that certain physical restrictions were appropriate, including no frequent kneeling, squatting or climbing and no frequent bending, twisting or lifting greater than twenty to twenty-five pounds. (AR 69). Moreover, despite Plaintiff's claim of disabling pain, he noted that her medication was minimal

(e.g., occasional use of Tylenol #3, Darvcocet N50 and Flexeril).  (AR 69).  Plaintiff's occupation required a light physical capacity due to her need to stand half the day.  Dr. Brown concluded that Plaintiff was capable of performing the essential duties of her light duty occupation as branch operations supervisor on a full-time basis.  (AR 70).

On May 14, 2002, Liberty wrote to Plaintiff advising that it was not changing its earlier decision.  (AR 64-67).  In that letter, Liberty explained that during the appeal process it had reviewed additional medical information, including Dr. Sterling's November 25, 2001 letter stating that if the demands of her job were consistent with the restrictions stated by Dr. Rosenberg, then Plaintiff would be able to work.  (AR 64-65).  Further, Liberty explained that it had contacted Fleet to determine if the restrictions and limitations presented by Dr. Rosenberg were consistent with the demands of her job and received confirmation that her level of functioning was consistent with the job demands.  Moreover, because Plaintiff had submitted additional medical records and since she claimed that her condition had worsened, in order to provide a full and fair review, Plaintiff's entire file was submitted to Dr. Brown, a consulting physician specializing in physical medicine and rehabilitation.  Liberty wrote that Dr. Brown had concluded that despite the absence of objective medical evidence substantiating impairment, certain physical restrictions appeared reasonable and appropriate, including no frequent to constant kneeling, squatting or climbing and no frequent to constant bending, twisting or lifting greater than twenty to twenty-five pounds. (AR 66-67).  According to Liberty, Drs. Rosenberg, Sterling (Plaintiff's treating physiatrist) and Brown had documented her functional capacity, and that such level of functional capacity was compatible with the demands required by her own occupation.  (AR 67).

Subsequent to the denial of her appeal, Plaintiff underwent a provocative Discography. In March 2003, she was found to be disabled as of May 14, 2001 by the Social Security Administration. In June 2003, she underwent the following surgical procedures: Partial L4 Laminectomy; L4-5 Facetectomy and Posterior Lumbar Interbody Fusion with Femoral Ring Allograft; L4-5 Posterolateral Stabilization with Sofamor-Danek TSRH Pedicle Screw Instrumentation and Fusion with Spino-Laminar Autograft. (AR 037-41).

By letter dated January 20, 2004, counsel for Plaintiff wrote to Liberty. The letter provided in part: "It appears from the documentation provided to me by my client, it appears [sic] that Liberty Life's denial of this claim is "final," and that no further administrative reviews are available to the claimant. Please advise me if this is the case or not." The letter goes to to elucidate two "important facts" Liberty should be aware of "[i]n the event that further reviews are available . . . ." On February 10, 2004, Liberty wrote to Plaintiff's counsel that the denial of the claim was final. This action was commenced on November 9, 2005.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates both the absence of a genuine issue of material fact and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *See Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56(c)).

When determining whether a genuinely disputed factual issue exists, "a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability," or "the substantive evidentiary standards that apply to the case." *Anderson*, 477 U.S. at 254-55. The court must resolve all factual ambiguities and draw all reasonable inferences in favor of the non-moving party. *See Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir. 1987). A district court considering a summary judgment motion must also be "mindful of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the evidentiary burdens that the respective parties will bear at trial guide the district court in its determination of a summary judgment motion. *See Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). Where the non-moving party will bear the ultimate burden of proof on an issue at trial, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the non-movant's claim. *See id.* at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that [her] claim is not 'implausible.'" *Brady*, 863 F.2d at 211 (citing *Matsushita*, 475 U.S. at 587).

## II. The Statute of Limitations

In support of their motion for summary judgment, Defendants argue that this action is barred by the Policy's limitation of action provision. According to Defendants, Liberty issued its final determination on May 14, 2002 and Plaintiff waited until November 9, 2005 to commence this action whereas the Policy requires that actions be commenced within one year from the determination.

Plaintiff's response is twofold. First, it is argued that the shortened limitation period is unenforceable because although contained in the Policy, the limitations period was not contained in the SPD. Second, Plaintiff maintains that under New York Insurance Law § 3216(d)(1)(k), group disability insurance policies issued in New York must provide at least three years for filing of a lawsuit and therefore the Policy's one year limitation period is invalid.

In reply, Defendants argue that the SPD clearly states, in more than one provision that in the event of a discrepancy between the SPD and the Policy, the terms of the Policy control. Also, Plaintiff was not likely prejudiced by the omission in the SPD as the shortened statute of limitations is set forth in the Certificate of Coverage and "it should be presumed that [Plaintiff] received the Certificate as her attorney has purportedly quoted from the Certificate." Defs.' Reply Mem at 3. The certificate summarizes certain provisions of the LTD Plan and Policy and is issued by Liberty to Fleet for distribution to Fleet's employees. Defendants do not address the issue of the New York Insurance Law § 3216.

ERISA does not provide a limitations period and therefore courts generally apply "the most nearly analogous state limitations statute." *Miles v. New York State Teamsters Conference Pension & Ret. Fund*, 698 F.2d 593, 598 (2d Cir. 1983). Based on this principle, the Second

Circuit has held that in New York, the six-year statute of limitations for breach of contract claims generally govern ERISA claims for denial of benefits. *Id.* Parties to a contract may agree, however, to a shorter statute of limitations and section 201 of the New York CPLR permits such agreements so long as the shortened period is memorialized in a written agreement between the parties. N.Y. CPLR 201.

Here, there is no evidence that Plaintiff received a copy of the Plan and it is undisputed that the SPD did not contain the shortened limitations period.

ERISA require employers to provide their employees with SPD, which are designed to describe the circumstances which may result in plan ineligibility, disqualification, or a denial of benefits. *See* 29 U.S.C. § 1022. ERISA contemplates the SPD will serve as an "employee's primary source of information regarding employment benefits and employees are entitled to rely on the descriptions contained in the summary." *Burke v. Kodak Ret. Income Plan,* 336 F.3d 103, 110 (2d Cir. 2003).

The shortened limitations period for actions to recover benefits, which would have the effect of shortening the statute of limitations generally applicable to benefits claims under ERISA in New York by five years "qualifies as a 'circumstance which may result in disqualification, ineligibility, or denial or loss of benefits' that should have been disclosed to plaintiff[] via the SPD. . . . Absent such a provision, the SPD in this case 'had the effect of failing to inform' plaintiff[] of a key limitation on the[] right to recover benefits under the Plan." *Manginaro v. Welfare Fund of Local 771*, 21 F. Supp. 2d 284, 293-94 (S.D.N.Y. 1998) (citations and brackets omitted). *Accord Shore v. PaineWebber Long Term Disability Plan*, 2007 WL 3047113 * 9 (S.D.N.Y. Oct. 15, 2007).

19

Nor is the Court persuaded by Defendants' argument concerning the Certificate of Coverage. According to the affidavit submitted by Defendants, Liberty delivered the Certificate of coverage to Fleet for distribution to employees. There is no evidence, however, that Fleet did, in fact, distribute it to Plaintiff. Moreover, the Court rejects Defendants' argument that this Court should presume Plaintiff had the Certificate of Coverage prior to May 14, 2003 (one year from May 14, 2002 when her claim was denied) because her counsel quoted from it in a letter dated January 2004 and therefore was not prejudiced by the omission in the SPD.

Accordingly, the Court finds that a six year statute of limitations applies to Plaintiff's claim.[2] Applying that statute of limitations, Plaintiff's benefit claim is timely. Defendants' motion for summary judgment on statute of limitations grounds is denied.

**II.** *Standard of Review Governing Liberty's Determination Denying Plaintiff's Claim for Long-Term Disability Benefits*

Before reaching the merits of the parties' arguments regarding the reasonableness of Liberty's decision to deny Plaintiff long-term disability benefits under the Plan, the Court must first address the threshold issue of what standard of review applies to that determination. In *Firestone Tire and Rubber Co. v. Bruch*, the Supreme Court held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." 489 U.S. 101, 115 (1989); *see also Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 249 (2d Cir. 1999). If such discretion is

---

[2] Given the Court's ruling that the shortened statute of limitations is unenforceable because it is not contained in the SPD, it is unnecessary for the Court to address Plaintiff's argument that the one year limitation period in the Policy is invalid under N.Y. Insur. Law § 3216(d)(1)(K).

given, a district court must review the administrator's denial of benefits deferentially, and may reverse only if the arbitrator's decision was arbitrary and capricious.[3]  *See id.*

Plaintiff concedes that the Plan grants Liberty "discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan."  Nevertheless, she argues that de novo review is appropriate here because Liberty's claim determination process was plagued with conflict of interest.

### A.      Conflict Exception to the Arbitrary and Capricious Rule

Under Second Circuit law, an exception to applying the arbitrary and capricious standard of review may be invoked if the plaintiff establishes that the administrator had an actual conflict of interest and that such conflict in fact "affected the reasonableness of the administrator's decision."  *Whitney v. Empire Blue Cross & Blue Shield*, 106 F.3d 475, 477 (2d Cir. 1997) (citations and internal quotation marks omitted).  The burden of proof on these two requirements falls to the plaintiff.  *See Pulvers v. First UNUM Life Ins. Co.*, 210 F.3d 89, 92 (2d Cir. 2000).  "If the court finds that the administrator was in fact influenced by the conflict of interest, the deference otherwise accorded the administrator's decision drops away and the court interprets the plan de novo."  *Sullivan v. LTV Aerospace & Defense Co.*, 82 F.3d 1251, 1256 (2d Cir. 1996).  If the plaintiff cannot carry this burden, any conflict the administrator has is simply

---

[3]  Under the arbitrary and capricious standard of review, the Court may overturn a decision to deny benefits only if it is "'without reason, unsupported by substantial evidence or erroneous as a matter of law.'"  *Kinstler*, 181 F.3d at 249 (quoting *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir. 1995)).  This scope of review is narrow and the Court is not permitted to substitute its own judgment for that of the decision maker.  *Pagan*, 52 F.3d at 442.

one more factor to be considered in determining whether the challenged decision was arbitrary and capricious. *Pulvers*, 210 F.3d at 92.

**B.** ***Plaintiff's Allegations of Conflict***

Plaintiff alleges that Liberty operated under a conflict of interest in making its determination because it had a financial interest in the outcome of the benefits decision and therefore served as both plan administrator and payor of Plaintiff's claim. The Second Circuit has repeatedly held that the fact that a defendant "served as both plan administrator and plan insurer, although a factor to be weighed in determining whether there has been an abuse of discretion, is alone insufficient as a matter of law to trigger stricter review." *Id.* at 92 (citation and internal quotation marks omitted). Therefore, Plaintiff's allegations that Liberty had a conflict of interest because of its financial interest does not justify application of a de novo standard of review.

**C.** ***The Decision to Deny Benefits was not Arbitrary and Capricious***

**1.** ***Definition of Applicable Standard***

Under the arbitrary and capricious standard of review, the Court may overturn a decision to deny benefits only if it is "'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Kinstler*, 181 F.3d at 249 (quoting *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir. 1995)). "Substantial evidence is 'such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [administrator and] . . . requires more than a scintilla but less than a preponderance." *Celardo v. GNY Automobile Dealers Health & Welfare Trust*, 318 F.3d 142, 145 (2d Cir. 2003) (quoting *Miller v. United Welfare Fund*, 72 F.3d 1066, 1071, 1072 (2d Cir. 1995)).

This scope of review is narrow and the Court is not permitted to substitute its own judgment for that of the decision maker. *Pagan*, 52 F.3d at 442; *see also Jordan v. Ret. Comm. of Rensselaer Polytechnic Inst.*, 46 F.3d 1264, 1271 (2d Cir. 1995) ("The court may not upset a reasonable interpretation by the administrator."). Thus, "[t]he question before a reviewing court under this standard is 'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Jordan*, 46 F.3d at 1271 (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)) (internal citation and quotation marks omitted). Moreover, in its narrow review, a court may not consider evidence beyond the administrative record; it should consider only the information presented prior to the administrator's final determination. *Miller v. United Welfare Fund*, 72 F.3d 1066, 1071 (2d Cir. 1995); *Klecher v. Met. Life Ins. Co.*, 2005 WL 1337509 *8 (S.D.N.Y. June 6, 2005), *aff'd*, 167 Fed. Appx. 287 (2d Cir. 2006).

## 2.    *The Decision to Deny Benefits*

Plaintiff's first argument in support of her claim that the denial of LTD benefits was arbitrary and capricious is that Liberty Life ignored the policy's definition of disabled. She asserts:

> Under that definition of disability, [Plaintiff] must be considered "disabled" and entitled to benefits if "during the Elimination period and the next 24 months of Disability the Covered is unable to perform **all** of the material and substantial duties of her occupation on  Active Employment basis because of Injury or Sickness" . . . . In other words, if there is a single job duty that she cannot perform, she is disabled and entitled to benefits. If Fleet needed to make any accommodation to allow [Plaintiff] to return to work during this period of time, then she is entitled to benefits.

Pl.'s. Mem in Supp. at 14 (emphasis in original).

The Court finds this argument unpersuasive. First, it is incorrect to say that a claimant is entitled to benefits if there is "a single job duty" that she cannot perform. What the Policy does say is that a claimant must be unable to perform "all of the material and substantial duties." It is the inability of a claimant to perform a single "material and substantial" duty that brings the claimant within the Policy's definition of disabled. Therefore, Defendants' conclusion that if restrictions and/or limitations impact only tasks that are not "material and substantial" a claimant is not disabled is neither arbitrary nor capricious. It is also incorrect to say that if Fleet needed to make "any accommodation" to allow Plaintiff to return to work then she is entitled to benefits. If the inability to perform tasks that are not "material and substantial" does not render a claimant disabled, then it is permissible to accommodate those restrictions and limitations that do not affect the ability to perform material and substantial tasks. Here what Liberty did was to ask Fleet whether Plaintiff's physical restrictions/capabilities "are consistent with job demands." Fleet replied that they were and that if occasional tasks "entailing bending be needed, co-workers are available to perform same." If the occasional bending could be performed by other employees, it was neither arbitrary or capricious for Liberty to conclude that bending, while "a" duty of Plaintiff's job, was merely ancillary and not a "material and substantial" one.

*Kalish v. Liberty Mutual/Liberty Assur. Co.*, 419 F.3d 501 (6th Cir.2005), relied upon by Plaintiff, is distinguishable. There the Sixth Circuit found that the insurance company's determination that the claimant was not disabled was arbitrary and capricious, inter alia, because it relied on an expert who stated that the claimant could return to a position requiring "light activity" but did not address whether he return to his "high-stress" position. *Id.* at 510.

Plaintiff also claims that Liberty disregarded her own occupation because it did not refer to the Dictionary of Occupational Titles (4th Ed. Rev. 1991) (the "DOT").  Continuing, if the DOT had been consulted, Plaintiff's position of Branch Operations Supervisor I would be classified as a "light" occupation corresponding to the occupation of Assistant Branch Manager in the DOT.

Plaintiff, however, cites no authority either requiring the use of the DOT or finding that the failure to refer to it was arbitrary and capricious.  Indeed, at least one court found that an administrator's "reflexive use" of the DOT and failure to consider the actual duties of the Plaintiff's job and the institution where she worked  was arbitrary and capricious.  *Shore*, 2007 WL 3047113 at *12-13.  Here, Liberty relied upon Fleet's corporate office and the physical job evaluation completed by Fleet to determine the material and substantial duties of Plaintiff's occupation.  It was reasonable for it do so.  *Cf. id*; *Robbins v. Aetna Ins. Co.*, 2006 WL 2589359 *10 (Sept. 8, 2006); *Klecher v. Met. Life Ins. Co.*, 2005 WL 1337509 *10 (S.D.N.Y. June 6, 2005).

Plaintiff also argues that Liberty acted arbitrarily in giving the opinions of Dr. Rosenberg and Dr. Brown controlling weight.  According to Plaintiff, "Federal Rule of Evidence 702 - which governs the admissibility of expert testimony in the federal courts - does provide some guidance for the courts in evaluating whether or not the carrier's decision as to the relative weights of these opinions was arbitrary and capricious."  Pl's. Mem. in Supp. at 17.  Applying the standards of Rule 702 and *Daubert*[4] illustrates that Liberty's weighing of the medical evidence

---

[4]*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) is a seminal case applying Federal Rule of Evidence 702.

was arbitrary and capricious because, it is argued, Dr. Brown never examined or even spoke to Plaintiff.

Plaintiff provides no support for importing the requirements of federal evidentiary rules on the admissibility of expert opinion at trial to the present situation. The Court declines the opportunity to do so here. Assuming *arguendo*, the requirements of Rule 702 and *Daubert* are applicable, the argument must fail. Dr. Brown reviewed the medical records submitted by Plaintiff, as well as the records of the IME conducted by Dr. Rosenberg. The Federal Rules of Evidence clearly permit an expert to base his opinion on facts and data that are of a type reasonably relied upon by experts in the field. *See* Fed. R. Evid. 703. The Advisory Committee's comments to Rule 703 are instructive:

> The third source of data contemplated by the rule consists of presentation of data to the expert outside of court and other than by his own perception. . . to bring the judicial practice into line with the practice of the experts themselves when not in court. Thus a physician in his own practice bases his diagnosis on information from numerous sources and of considerable variety, including statements by patients and relatives, reports and opinions from nurses, technicians and other doctors, hospital records and X Rays.

Fed. R. Evid. 703 advisory committee's note (1972). There can be no doubt that Dr. Brown's opinion would not be excluded under the Federal Rules merely because Dr. Brown did not personally examine Plaintiff but rather reviewed her medical records. Finally, Rule 702 and *Daubert* relate to a court's gatekeeping function in admitting expert testimony. Once admitted it is for the trier of fact to weigh the opinion.

In *Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003), the Supreme Court ruled that ERISA claim administrators are not required to accord treating physicians special

deference in ERISA claims for denial of benefits.  Nor may courts "impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Id.* at 834.  Liberty was under no obligation to accord greater weight to Plaintiff's treating doctor than to its own doctor, Dr. Rosenberg.   Dr. Rosenberg both examined Plaintiff and reviewed objective material such as MRIs to support his opinion.  It was not unreasonable for Liberty to rely on Dr. Rosenberg's opinion. *See generally Couture v. Unum Provident Corp.*, 315 F. Supp.2d 418, 431-32 (S.D.N.Y. 2004) (finding administrator's reliance on objective evidence over subjective evidence is not unreasonable).

Finally, the Court is underwhelmed by Plaintiff's argument that Plaintiff's treating physician's disability opinion was

> vindicated in Liberty Life's own "administrative record.."
> Specifically, the court must take note of the June 5, 2003 surgical report of Dr. Labiak.  On that date. [Plaintiff] underwent the following surgical procedures: Partial L4 Laminectomy; L4-5 Facetectomy and Posterior Lumbar Interbody Fusion with Femoral Ring Allograft; L4-5 Posterolateral Stabilization with Sofamor-Danek TSRH Pedicle Screw Instrumentation and Fusion with Spino-Laminar Autograft.

Pl.'s Supp. Mem. at 20.  These procedures took place more than one year after Liberty's final determination.  Hindsight is "20/20."  In any event, a claimant may not continue to submit material after a final denial in an effort to expand the record and then claim that its consideration is required. *Cf. Paese v. Hartford Life & Accident Ins. Co.*, 449 F.3d 435, 441 (2d Cir. 2006) (stating that when the administrator is not disinterested, "the decision whether to admit additional evidence is one which is discretionary with the district court, but which discretion ought not to be exercised in the absence of good cause").  Without any assurance that between the denial of

benefits in May 2002 and the June 2003 surgery there was (1) no worsening of Plaintiff's conditions and (2) no events (such as car accident or a fall) that may have precipitated the need for such surgery, the Court declines to consider Dr. Labiak's report.

## CONCLUSION

For the reasons set forth above and having carefully considered the administrative record and parties' submissions, Defendants' motion for summary judgment is granted and Plaintiff's cross-motion is denied.  The Clerk of Court is directed to close this case.

**SO ORDERED.**

Dated: Central Islip, New York
March 31, 2008

/s/_____
Denis R. Hurley
Senior District Judge